IN THE SUPREME COURT OF NORTH CAROLINA

No. 54A20

Filed 11 December 2020

IN THE MATTER OF: N.K.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 12 November 2019 by Judge B. Carlton Terry, Jr., in District Court, Davidson County. This matter was calendared for argument in the Supreme Court on 23 November 2020, but was determined upon the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Danielle De Angelis for petitioner-appellee Davidson County Department of Social Services.*

*Chelsea K. Barnes for appellee Guardian ad Litem.*

*Jeffrey L. Miller for respondent-appellant mother.*

ERVIN, Justice.

Respondent-mother Amber K. appeals from the trial court's order terminating her parental rights in her son N.K.[1] After careful review of respondent-mother's challenges to the trial court's order in light of the record and the applicable law, we conclude that, while the trial court correctly applied North Carolina law in terminating respondent-mother's parental rights in Ned, this case should be

---

[1] N.K. will be referred to throughout the remainder of this opinion as "Ned," which is a pseudonym that will used to protect the identity of the juvenile and for ease of reading.

remanded to the District Court, Davidson County, for further proceedings intended to ensure compliance with the Indian Child Welfare Act. [2]

## I. Factual Background

On 26 February 2018, within a week after his birth, the Davidson County Department of Social Services filed a petition alleging that Ned was a neglected and dependent juvenile and obtained the entry of an order taking Ned into nonsecure custody. In its petition, DSS alleged that respondent-mother had tested positive for the presence of marijuana at the time of Ned's birth; that respondent-mother had a history of substance abuse problems; that respondent-mother had untreated mental health problems; that Ned had an older full sibling and two older half siblings, all of whom had been taken into the custody of the Davie County Department of Social Services based upon reports of improper supervision and abuse; that respondent-mother had been charged with assaulting a child under twelve; and that there were concerns about domestic violence between the parents.

In advance of the hearing to be held for the purpose of considering the merits of the allegations made in the DSS petition, respondent-mother completed an assessment at Daymark in early March 2018 and began recommended mental health and substance abuse treatment. In addition, respondent-mother entered into an Out

---

[2] The trial court's order also terminated the parental rights of Ned's father. However, since the father is not a party to the present appeal, we will refrain from discussing the proceedings relating to him in any detail in this opinion.

of Home Family Services Agreement with DSS on 16 March 2018 in which she agreed to complete mental health and substance abuse treatment and to authorize the release of treatment-related information to DSS, to provide verification of her income, to obtain and maintain suitable housing, to visit with Ned and attend his medical and developmental appointment; to complete an updated psychological evaluation or parenting capacity assessment and comply with any resulting recommendations, to refrain from engaging in domestic violence and to participate in a domestic violence treatment program, and to maintain contact with DSS.

The DSS petition came on for an adjudication hearing on 28 March 2018. At that time, DSS and Ned's parents entered into a stipulation with DSS that certain facts existed and that Ned could be adjudicated to be a neglected and dependent juvenile. On 25 April 2018, Judge Mary F. Paul (now Covington) entered an order finding Ned to be a neglected and dependent juvenile. After a dispositional hearing held on 25 April 2018, Judge Paul entered a dispositional order on 29 May 2018 ordering that Ned remain in DSS custody, establishing a visitation plan, and ordering respondent-mother to comply with the provisions of her service agreement.

After a review and permanency planning hearing on 5 September 2018, Judge Covington entered an order on 28 November 2018 finding that respondent-mother had stopped attending mental health and substance abuse treatment in June 2018, had resumed the use of impairing substances, and had not reengaged in mental health and substance abuse treatment despite promising DSS that she would do so.

In addition, Judge Covington found that respondent-mother's housing had been unstable; that she had failed to take advantage of referrals relating to housing, income support, and employment; that she had failed to participate in a scheduled parenting capacity assessment; that she had acknowledged the occurrence of incidents of physical aggression against the father that had resulted in the entry of a protective order against her; and that she had violated the protective order, resulting in the institution of new criminal charges against her. On the other hand, Judge Covington found that respondent-mother had attended the majority of her scheduled visits with Ned and had remained in contact with DSS. In light of these findings, Judge Covington ordered that Ned remain in DSS custody, established "a primary plan of termination of parental rights and adoption and a secondary plan of reunification with a parent," reduced the amount of visitation that respondent-mother was entitled to have with Ned, and ordered respondent-mother to comply with the provisions of her service agreement.

Another review and permanency planning hearing was held on 6 March 2019. In an order entered on 18 April 2019, Judge Covington changed the permanent plan for Ned to "a primary plan of termination of parental rights and adoption and a secondary plan of guardianship with a court approved caretaker" and relieved DSS from the necessity for making any further efforts to reunify Ned with respondent-mother. Finally, Judge Covington reduced the amount of visitation that respondent-mother was entitled to have with Ned even further.

On 23 April 2019, DSS filed a petition seeking to terminate respondent-mother's parental rights in Ned based upon neglect, N.C.G.S. § 7B-1111(a)(1); willful failure to make reasonable progress toward correcting the conditions that had led to Ned's removal from the family home, N.C.G.S. §7B-1111(a)(2); failure to pay a reasonable portion of the cost of the care that Ned had received while in DSS custody, N.C.G.S. § 7B-1111(a)(3); and dependency, N.C.G.S. § 7B-1111(a)(6). Respondent-mother filed a verified answer denying the material allegations contained in the termination petition on 8 May 2019.

The termination petition came on for hearing before the trial court on 24 October 2019. On 12 November 2019, the trial court entered an order terminating respondent-mother's parental rights in Ned. In its termination order, the trial court found that respondent-mother's parental rights in Ned were subject to termination based upon neglect, N.C.G.S. § 7B-1111(a)(1), and willful failure to make reasonable progress toward correcting the conditions that had led to Ned's removal from the family home, N.C.G.S. § 7B-1111(a)(2), and that the termination of respondent-mother's parental rights would be in Ned's best interests. Respondent-mother noted an appeal to this Court from the trial court's termination order.

## II. Substantive Legal Analysis

### A. Competency Inquiry

In seeking relief from the trial court's termination order before this Court, respondent-mother begins by arguing that the trial court had abused its discretion

by failing to conduct an inquiry regarding her competency on its own motion for purposes of determining whether she was entitled to the appointment of a guardian *ad litem*. A parent's entitlement to the appointment of a guardian *ad litem* in juvenile proceedings, including those involving a request for the termination of parental rights, is governed by N.C.G.S. § 7B-1101.1(c) (2019), which provides that, "[o]n motion of any party or on the court's own motion, the court may appoint a guardian ad litem for a parent who is incompetent in accordance with [N.C.]G.S. [§] 1A-1, Rule 17." An "incompetent adult" for purposes of N.C.G.S. 1A-1, Rule 17, is an adult "who lacks sufficient capacity to manage the adult's own affairs or to make or communicate important decisions concerning the adult's person, family, or property whether the lack of capacity is due to mental illness, intellectual disability, epilepsy, cerebral palsy, autism, inebriety, senility, disease, injury, or similar cause or condition." N.C.G.S. § 35A-1101(7) (2019).

"A trial judge has a duty to properly inquire into the competency of a litigant in a civil trial or proceeding when circumstances are brought to the judge's attention [that] raise a substantial question as to whether the litigant is *non compos mentis*." *In re T.L.H.*, 368 N.C. 101, 106, 772 S.E.2d 451, 455 (2015) (quoting *In re J.A.A.*, 175 N.C. App. 66, 72, 623 S.E.2d 45, 49 (2005)). "[T]rial court decisions concerning both the appointment of a guardian *ad litem* and the extent to which an inquiry concerning a parent's competence should be conducted are reviewed on appeal using an abuse of discretion standard." *Id.* at 107, 772 S.E.2d at 455. "An '[a]buse of discretion results

where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.' " *Id.* (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)).

In *In re T.L.H.*, this Court specifically addressed "the extent to which a trial court must inquire into a parent's competence to determine whether it is necessary to appoint a guardian *ad litem* for that parent despite the absence of any request that such a hearing be held or that a parental guardian *ad litem* be appointed." *Id.* at 102, 772 S.E.2d at 452. After acknowledging the applicability of the abuse of discretion standard to the issue under consideration, we explained that the trial court should be afforded substantial deference in deciding whether an inquiry into a litigant's competence ought to be undertaken given that it "actually interacts with the litigant whose competence is alleged to be in question and has, for that reason, a much better basis for assessing the litigant's mental condition than that available to the members of an appellate court, who are limited to reviewing a cold, written record." *Id.* at 108, 772 S.E.2d at 456.

> As a result, when the record contains an appreciable amount of evidence tending to show that the litigant whose mental condition is at issue is not incompetent, the trial court should not, except in the most extreme instances, be held on appeal to have abused its discretion by failing to inquire into that litigant's competence.

*Id.* at 108–09, 772 S.E.2d at 456.

In spite of the significant mental health issues disclosed in the record before us in that case, we held in *In re T.L.H.* that "sufficient evidence tending to show that [the] respondent was not incompetent existed to obviate the necessity for the trial court to conduct a competence inquiry before proceeding with the termination hearing." *Id.* at 109, 772 S.E.2d at 456. In reaching this conclusion, we noted that the respondent "exercised what appears to have been proper judgment in allowing DHHS to take custody of [the child,]" "demonstrated a reasonable understanding of the proceedings that would inevitably result from that decision[,]" provided cogent testimony at a permanency planning hearing that demonstrated her understanding of her case plan and the consequences of her decisions, and took steps to comply with aspects of her case plan. *Id.* at 109, 772 S.E.2d at 456–57. As a result, this Court was "unable to conclude that the apparent failure to conduct such an inquiry constituted an abuse of discretion" given the existence of "ample support for a determination that respondent understood that she needed to properly manage her own affairs and comprehended the steps that she needed to take in order to avoid the loss of her parental rights . . . ." *Id.* at 108, 109, 772 S.E.2d at 456, 457.

In our recent decision in *In re Z.V.A.*, 373 N.C. 207, 835 S.E.2d 425 (2019), this Court applied the framework delineated in *In re T.L.H.* in holding that the trial court "did not abuse its discretion when it did not conduct an inquiry into [the respondent's] competency." *Id.* at 211, 835 S.E.2d at 429. In reaching this result, we reasoned that, despite the respondent's low intelligence quotient, she had been diagnosed with only

a "mild intellectual disability" in light of her demonstrated ability to work and to attend school. *Id.* at 210, 835 S.E.2d at 429. In addition, we noted that the existence of sufficient evidentiary support for the trial court's findings that the respondent had developed adaptive skills that lessened the impact of her disability and had engaged in portions of her case plan "d[id] not suggest [the respondent's] disability rose to the level of incompetence so as to require the appointment of a guardian *ad litem* to safeguard [the respondent's] interests." *Id.* at 211, 835 S.E.2d at 429.

In attempting to distinguish this case from *In re T.L.H.* and *In re Z.V.A.*, respondent-mother argues that the reason for our decision to give deference to the trial court, which revolved around the trial court's opportunity to observe the party whose competence is at issue on a first-hand basis, was "not helpful or decisive" in this case because respondent-mother did not testify at the termination hearing. In addition, respondent-mother argues that the record fails to contain sufficient evidence to support a finding that respondent-mother was not incompetent, with respondent-mother emphasizing the existence of evidence tending to show that she had significant mental health problems and failed to comply with the provisions of her service agreement as indicative of her lack of judgment and her inability to manage her own affairs. We do not find respondent-mother's arguments to be persuasive.

As an initial matter, we note that, even though the record contains no indication that respondent-mother testified before the trial court, it clearly shows

that respondent-mother was present for the pre-adjudicatory, adjudicatory, and dispositional hearings; for the subsequent review and permanency planning hearings; and for the termination hearing. As a result, Judge Covington and the trial court had ample opportunity to gauge respondent-mother's competence by observing her demeanor and behavior in court throughout the progress of the underlying neglect proceeding and the termination proceeding, making it completely appropriate for us to give deference to their failure to inquire into respondent-mother's competence.

Secondly, in spite of the fact that respondent-mother suffered from untreated mental health problems and had tested "in the range typically associated with a diagnosis of Mild Intellectual Deficits[,]"the record contains an appreciable amount of evidence tending to show that respondent-mother was not incompetent. According to the undisputed evidence and the trial court's unchallenged findings of fact, respondent-mother acknowledged the existence of her mental health and substance abuse problems at a relatively early stage and took steps to begin treatment for those problems. In addition, respondent-mother entered into a service agreement with DSS that was intended to address the reasons that led to Ned's placement in DSS custody and participated in negotiating a stipulation with DSS concerning the existence of certain facts and Ned's status as a neglected and dependent juvenile. Moreover, Judge Covington specifically found in the adjudication order that respondent-mother had appeared in open court and participated in the negotiation of the stipulations,

confirmed that she understood them, and had entered into these stipulations freely and voluntarily with the full understanding that they would result in a decision finding Ned to be a neglected and dependent juvenile. In the same vein, we note that respondent-mother verified the answer to the termination petition that was filed on her behalf, served as her own payee for purposes of receiving disability benefits, acknowledged her need for treatment, expressed a preference for participating in certain treatment programs as compared to others, and engaged in various treatment programs during the course of the juvenile proceedings. Finally, the record shows that respondent-mother expressed her preference that Ned be placed with members of her family, attended the majority of her scheduled visits with Ned, had routine contact with DSS, and was consistently available to the court, DSS, and Ned's guardian *ad litem*.

After examining the record before us in this case, we do not believe that this case involves the sort of "extreme instance" in which a trial judge would have abused his or her discretion by failing to inquire on his or her own motion into the extent, if any, to which respondent-mother was entitled to the appointment of a guardian *ad litem*. *In re T.L.H.*, 368 N.C. at 109, 772 S.E.2d at 456.

> We do not . . . wish to be understood as holding that the trial court would have had no basis for inquiring into respondent[-mother]'s competence in light of her history of serious mental health conditions. A trial court would have been well within the bounds of its sound discretion to conclude that respondent[-mother]'s lengthy history of serious mental illness raised a substantial question

> concerning her competence sufficient to justify further
> inquiry. In fact, such an inquiry in this case might well
> have been advisable.

*Id.* at 111–12, 772 S.E.2d at 458. On the other hand, given the opportunity that Judge Covington and the trial court had to observe respondent-mother in court and the appreciable amount of evidence in the record tending to show that respondent-mother was not incompetent, "we are unable to conclude that the trial court could not have had a reasonable basis for reaching the opposite result[.]" *Id.* at 112, 772 S.E.2d at 458. For that reason, we hold that, in this case, the trial court did not abuse its discretion by failing to conduct an inquiry into the issue of whether a guardian *ad litem* should have been appointed for respondent-mother.

### B. Analysis of the Trial Court's Termination Order

A termination of parental rights proceeding is conducted using a two-stage process that consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6, 832 S.E.2d 698, 700 (2019) (quoting N.C.G.S. § 7B-1109(f)). "If a trial court finds one or more grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it then proceeds to the dispositional stage," *id.* at 6, 832 S.E.2d at 700, at which it "determine[s] whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2019).

## 1. Grounds for Termination

In respondent-mother's view, the trial court erred by determining that her parental rights were subject to termination for neglect, N.C.G.S. § 7B-1111(a)(1), and failure to make reasonable progress toward correcting the conditions that had led to the child's removal from the family home, N.C.G.S. § 7B-1111(a)(2). "This Court reviews a trial court's adjudication decision pursuant to N.C.G.S. § 7B-1109 in order to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law, with the trial court's conclusions of law being subject to de novo review on appeal." *In re N.D.A.*, 373 N.C. 71, 74, 833 S.E.2d 768, 771 (2019) (cleaned up). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)). "[A] finding of only one ground is necessary to support a termination of parental rights[.]" *In re A.R.A.*, 373 N.C. 190, 194, 835 S.E.2d 417, 421 (2019).

A parent's parental rights in a child are subject to termination pursuant to N.C.G.S. § 7B-1111(a)(1) in the event that the parent has neglected the juvenile to such an extent that the juvenile is a "neglected juvenile" within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1) (2019). A neglected juvenile is defined as "[a]ny juvenile less than 18 years of age . . . whose parent . . . does not provide

proper care, supervision, or discipline; . . . or who lives in an environment injurious

to the juvenile's welfare[.]" N.C.G.S. § 7B-101(15) (2019).

> In deciding whether a child is neglected for purposes of terminating parental rights, the dispositive question is the fitness of the parent to care for the child at the time of the termination proceeding. In the event that a child has not been in the custody of the parent for a significant period of time prior to the termination hearing, requiring the petitioner in such circumstances to show that the child is currently neglected by the parent would make termination of parental rights impossible. In such circumstances, the trial court may find that a parent's parental rights in a child are subject to termination on the grounds of neglect in the event that the petitioner makes a showing of past neglect and a likelihood of future neglect by the parent. When determining whether future neglect is likely, the trial court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing. A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect.

*In re M.A.*, 374 N.C. 865, 869–70, 844 S.E.2d 916, 920–21 (2020) (cleaned up).[3]

The trial court concluded that respondent-mother's parental rights in Ned

were subject to termination for neglect based upon a determination that respondent-

mother "ha[d] neglected [Ned] within the meaning of N.C.[G.S.] § 7B-101(15) and it

is probable that there would be a repetition of the neglect of [Ned] if [he] were

---

[3] As we have noted today in our opinion in *In re R.L.D.*, No. 122A20, slip op. at 5 & n.3 (N.C. Dec. 11, 2020), a showing of past neglect and a probability of future neglect is not necessary to support a determination that a parent's parental rights in a juvenile are subject to termination on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1) in light of the fact that such a determination is also permissible in the event that there is a showing of current neglect.

returned to the care of [respondent-mother]." In support of this determination, the trial court made detailed findings of evidentiary fact, including findings that Ned had previously been determined to be a neglected juvenile on 25 April 2018 and that respondent-mother had made little progress toward completing the requirements of the service agreement that she had entered into with DSS. More specifically, the trial court found that respondent-mother had failed to address her mental health, substance abuse, and domestic violence problems; that she had failed to establish and maintain safe and appropriate housing; and that her failures to adequately address those problems demonstrated that there was a likelihood that Ned would be neglected in the future in the event that he was returned to her care.

Although respondent-mother has not challenged any specific finding of fact contained in the trial court's termination order as lacking in sufficient evidentiary support and, on the contrary, concedes that the trial court's findings are supported by "some form of evidence," she does argue that, since the trial court's findings resemble language found in findings of fact set out in other orders and in the reports that were admitted into evidence at the termination hearing and since these earlier findings and the report language were predicated upon the use of lower standards of proof than the clear, cogent, and convincing standard of proof that is applicable in termination proceedings, they should not have been used to support the findings that the trial court made in the termination order. *See* N.C.G.S. § 7B-1109(f). This argument lacks merit.

As this Court recognized in *In re T.N.H.*, the "trial court may take judicial notice of findings of fact made in prior orders, even when those findings are based on a lower evidentiary standard because[,] where a judge sits without a jury, the trial court is presumed to have disregarded any incompetent evidence and relied upon the competent evidence." 372 N.C. at 410, 831 S.E.2d at 60. On the other hand, we have also held that "the trial court may not rely solely on prior court orders and reports but must receive some oral testimony at the hearing and make an independent determination regarding the evidence presented." *Id.* At the termination hearing, the trial court took judicial notice of the underlying adjudicatory and dispositional orders, allowed the admission of reports from the DSS and Ned's guardian *ad litem* into evidence, and heard live testimony from the social worker responsible for overseeing Ned's case. After carefully reviewing the record, including the orders and reports that were made part of the record and the live testimony that was received at the termination hearing, we are satisfied that the findings of fact addressing the issue of whether respondent-mother's parental rights in Ned were subject to termination are proper in form and have adequate evidentiary support.

In addition, respondent-mother argues that the trial court erred by concluding that her parental rights in Ned were subject to termination for neglect on the grounds that the trial court had failed to consider whether her poverty and mental health difficulties adversely affected her ability to care for Ned. More specifically, respondent-mother argues that the trial court had failed to make adequate findings

of fact concerning the issue of whether her poverty and mental health problems were the sole reasons for her neglect of Ned and that the existence of these conditions "explain[s] and excuse[s] the facts used by the court for its grounds in termination." Once again, we do not find this argument persuasive.

Respondent-mother is, of course, correct in arguing that "her parental rights are not subject to termination in the event that her inability to care for her children rested solely upon poverty-related considerations[.]" *In re M.A.*, 374 N.C. at 881, 844 S.E.2d at 927 (citing N.C.G.S. § 7B-1111(a)(2) (2019) (providing that "[n]o parental rights . . . shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty")). Although the record contains evidence tending to show that respondent-mother had experienced financial difficulties, a careful analysis of the record shows that respondent-mother's inability to care for Ned did not stem solely from her poverty. The prior adjudication of neglect and the trial court's determination that there was a likelihood that Ned would be neglected in the event that he was returned to respondent-mother's care resulted from a combination of factors, including respondent-mother's substance abuse, mental health, and domestic violence problems. The evidence and the trial court's unchallenged findings of fact tend to show that respondent-mother failed to complete treatment that was intended to assist her in addressing those problems and that respondent-mother disregarded the treatment-related referrals and recommendations that she had received from DSS, that respondent-mother continued to use controlled substances,

and that respondent-mother continued to engage in acts of domestic violence against the father. Finally, the record contains evidence tending to show that, even though DSS referred respondent-mother to services that could have alleviated the financial hardships that she was experiencing relating to income, employment, housing, and transportation, respondent-mother refused to take advantage of the opportunities that were made available to her as a result of these referrals. As a result, we are satisfied that the trial court's unchallenged findings of fact and the record evidence establish that the trial court's decision to find that respondent-mother's parental rights in Ned were subject to termination for neglect pursuant to N.C.G.S. § 7B-1111(a)(1) rested upon considerations other than respondent-mother's poverty.

Similarly, respondent-mother asserts that the trial court's findings do not support a determination that her parental rights in Ned were subject to termination on the basis of neglect given that her inability to care for Ned resulted from the existence of her mental health problems. As we understand this aspect of her challenge to the lawfulness of the trial court's termination order, respondent-mother is effectively asserting that termination of parental rights on the grounds of neglect pursuant to N.C.G.S. § 7B-1111(a)(1) is impermissible in the absence of a showing of willfulness.[4] This Court has, however, recently held that "[w]hether the respondent-

---

[4] The only authority that respondent-mother has cited in support of her contention that a showing of willfulness must be made before a parent's parental rights in a child may be terminated for neglect is an unpublished decision of the Court of Appeals, *see In re M.A.F.,* 2010 WL 2163806 at *6 (N.C. Ct. App. 2010) (unpublished).

mother's failure to comply with her case plan was willful is not relevant to establish this ground for termination." *In re Z.K.*, 375 N.C. 370, 373, 847 S.E.2d 746, 748 (2020). On the contrary, we note that this Court held several decades ago that, "[i]n determining whether a child is neglected, the determinative factors are the circumstances and conditions surrounding the child, not the fault or culpability of the parent," *In re Montgomery*, 311 N.C. 101, 109, 316 S.E.2d 246, 252 (1984), and that, "[w]here the evidence shows that a parent has failed or is unable to adequately provide for his child's physical and economic needs, whether it be *by reason of mental infirmity* or by reason of willful conduct on the part of the parent, and it appears that the parent will not or is not able to correct those inadequate conditions within a reasonable time, the court may appropriately conclude that the child is neglected." *Id.* (emphasis added). As a result, we conclude that respondent-mother's assertion that a parent's parental rights in a child may not be terminated on the basis of neglect in the event that the parent's inability to provide adequate care for that child stems from mental health problems rests upon a misapprehension of well-established North Carolina law.

Thus, we hold that the trial court's unchallenged findings of fact establish that Ned had previously been found to be a neglected juvenile and that the neglect that Ned had previously experienced was likely to recur in the event that he was returned to respondent-mother's care given her failure to adequately address her substance abuse, mental health, and domestic violence problems and to obtain appropriate

housing. As a result, given that the existence of a single ground for termination suffices to support the termination of a parent's parental rights in a child, *In re A.R.A.*, 373 N.C. at 194, 835 S.E.2d at 421, we further hold that the trial court did not err as a matter of North Carolina law in determining that respondent-mother's parental rights in Ned were subject to termination for neglect pursuant to N.C.G.S. § 7B-1111(a)(1).

2.  Dispositional Determination

In her final challenge to the substance of the trial court's termination order, respondent-mother argues that the trial court erred by determining that the termination of her parental rights would be in Ned's best interests. In determining whether the termination of a parent's parental rights would be in a child's best interests,

> [t]he court may consider any evidence, including hearsay evidence as defined in [N.C.]G.S. [§]8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile. In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.

(5)     The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6)     Any relevant consideration.

N.C.G.S. § 7B-1110(a).  "The trial court's assessment of a juvenile's best interests at the dispositional stage is reviewed solely for abuse of discretion."  *In re A.U.D.*, 373 N.C. at 6, 832 S.E.2d at 700.  An "abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision."  *Id.* at 6–7, 832 S.E.2d at 700–01 (quoting *In re T.L.H.*, 368 N.C. at 107, 772 S.E.2d at 455).

In this case, the trial court made findings concerning each of the factors enumerated in N.C.G.S. § 7B-1110(a) in determining that the termination of respondent-mother's parental rights would be in Ned's best interests.  As part of this process, the trial court found that Ned was twenty months old; that the primary permanent plan for Ned was one of adoption; that the termination of respondent-mother's parental rights would aid in the implementation of Ned's permanent plan by freeing Ned for adoption; that Ned's current foster family, with whom he had been placed within six days after his birth, was ready, willing, and able to adopt him; that Ned had a stronger bond with respondent-mother than he did with the father, with whom he had a minimal bond; that the relationship between Ned and respondent-mother was more like that between acquaintances than that between family

members; that Ned was very bonded with his foster family, including both the parents and their children; and that all of Ned's needs were being met by his foster family, who had committed to providing him with a permanent home. Finally, the trial court found that Ned's foster parents had worked with the foster parents of Ned's full sibling, who was in foster care in Davie County, for the purpose of arranging visits between Ned and his sibling despite the absence of any court order requiring them to do so.

In view of the fact that respondent-mother has not challenged the trial court's dispositional findings as lacking in sufficient evidentiary support, those findings are binding upon this Court for purposes of appellate review. *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58. Instead, respondent-mother argues that the trial court abused its discretion at the dispositional phase of this termination proceeding by failing to make findings of fact concerning respondent-mother's poverty and mental health problems. In addition, respondent-mother argues that the fact that she did not have a strong bond with Ned stemmed from the limited visitation that she had been authorized to have with her child and that the trial court had erred by failing to consider whether the implementation of an alternative plan of guardianship that included continued visitation intended to preserve the family unit would be in Ned's best interests. Once again, we do not find respondent-mother's arguments to be persuasive.

Aside from asserting that her poverty and mental health problems had contributed to the existence of the conditions that had led to the trial court's determination that her parental rights in Ned were subject to termination, respondent-mother has failed to explain how the issues of poverty and mental health were related to the dispositional decision that the trial court was required to make at the second stage of this proceeding. Moreover, we are unable to see how the factors upon which respondent-mother relies in support of this aspect of her argument support a reversal of the trial court's dispositional decision. As an additional matter, we note that this Court has rejected arguments that the trial court commits error at the dispositional stage of a termination of parental rights proceeding by failing to explicitly consider non-termination-related dispositional alternatives, such as awarding custody of or guardianship over the child to the foster family, by reiterating that "the paramount consideration must always be the best interests of the child." *In re J.J.B.*, 374 N.C. 787, 795, 845 S.E.2d 1, 6 (2020); *see also In re Z.A.M.*, 374 N.C. 88, 100–01, 839 S.E.2d 792, 800–01 (2020); *In re Z.L.W.*, 372 N.C. 432, 438, 831 S.E.2d 62, 66 (2019). As we have previously explained,

> [w]hile the stated policy of the Juvenile Code is to prevent "the unnecessary or inappropriate separation of juveniles from their parents," N.C.G.S. § 7B-100(4) (2017), we note that "the best interests of the juvenile are of paramount consideration by the court and . . . when it is not in the juvenile's best interest to be returned home, the juvenile will be placed in a *safe, permanent home within a reasonable amount of time*," *id.* § 7B-100(5) (2017) (emphasis added); *see also In re Montgomery*, 311 N.C. at

> 109, 316 S.E.2d at 251 (emphasizing that "the fundamental
> principle underlying North Carolina's approach to
> controversies involving child neglect and custody [is] that
> the best interest of the child is the polar star").

*In re Z.L.W.*, 372 N.C. at 438, 831 S.E.2d at 66.

After having made sufficient findings of fact concerning the dispositional factors enumerated in N.C.G.S. § 7B-1110(a), the trial court determined that "[Ned] is in need of a safe, stable home and a permanent plan of care at the earliest possible age which only can be obtained by the severing of the relationship between the child and [respondent-mother] and by the termination of parental rights[.]" In view of the fact that "the trial court made sufficient dispositional findings and performed the proper analysis of the dispositional factors, we are satisfied the trial court's best interests determination was not manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision." *In re Z.A.M.*, 374 N.C. at 100, 839 S.E.2d at 801; *see also In re J.J.B.*, 374 N.C. at 796, 845 S.E.2d at 7. As a result, we hold that the trial court did not abuse its discretion by concluding that termination of respondent-mother's parental rights would be in Ned's best interests.

## C. Indian Child Welfare Act

In her brief before this Court, respondent-mother argues that the trial court erred by terminating her parental rights in Ned in the absence of a showing of

compliance with the requirements of ICWA. 25 U.S.C. §§ 1901–1963 (2018).[5] We recently addressed the manner in which ICWA should be applied in *In re E.J.B.*, 375 N.C. 95, 846 S.E.2d 472 (2020). As we recognized in that decision, ICWA, which was enacted by Congress in 1978, "established 'minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes' in order to 'protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.' " *Id.* at 98, 846 S.E.2d at 474 (quoting 25 U.S.C. § 1902 (2018)). In order to achieve that goal, ICWA enacted notice requirements that are applicable to State court child custody proceedings involving Indian children, including proceedings involving requests for the termination of a parent's parental rights. 25 U.S.C. § 1912(a) (2018); *see also* 25 U.S.C. § 1903(1)(ii) (2018) (defining "child custody proceeding" to include requests that a parent's parental rights be terminated). ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 U.S.C. § 1903(4) (2018). ICWA's notice provisions require that:

> [i]n any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the . . . termination of parental

---

[5] We use the terms "Indian" and "Indian child" in order that our opinion will be worded consistently with the terminology used in ICWA. *See In re E.J.B.*, 375 N.C. C. at 95, 846 S.E.2d at 473 n.1.

rights to[ ] an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided*, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

25 U.S.C. § 1912(a) (2018).

The Department of the Interior adopted binding regulations in order to ensure the uniform application of ICWA in 2016. *In re E.J.B.*, 375 N.C. at 101, 846 S.E.2d at 476 (citing Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778 38,782 (June 14, 2016) (20 be codified at 25 C.F.R. pt. 23)). As we explained in *In re E.J.B.*, these regulations updated the existing notice provisions and added Subpart I, *see* 25 C.F.R. §§ 23.101–.144; *see also* Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38,867–68, pursuant to which "state courts bear the burden of ensuring compliance with the Act." *In re E.J.B.*, 375 N.C. at 101, 846 S.E.2d at 476 (citing 25 C.F.R. § 23.107(a)–(b); *see also In re L.W.S.*, 255 N.C. App. 296, 298 n.4, 804 S.E.2d 816, 819, n.4 (2017)). Among other things, the 2016 regulations provide that "[s]tate courts must ask each participant in a child custody proceeding, on the record, whether that participant knows or has reason to know that the matter involves an Indian child"

and "inform the parties of their duty to notify the trial court if they receive subsequent information that provides reason to know the child is an Indian child." *In re E.J.B.*, 375 N.C. at 101, 846 S.E.2d at 476 (citing 25 C.F.R. § 23.107(a)).

> If there is reason to know the child is an Indian child, but the court does not have sufficient evidence to determine that the child is or is not an "Indian child," the court must:
>
> (1) Confirm, by way of a report, declaration, or testimony included in the record that the agency or other party used due diligence to identify and work with all of the Tribes of which there is reason to know the child may be a member (or eligible for membership), to verify whether the child is in fact a member (or a biological parent is a member and the child is eligible for membership) . . . .

25 C.F.R. § 23.107(b). Although "[s]tate courts should seek to allow tribes to determine membership . . . ," *In re E.J.B.*, 375 N.C. at 102, 846 S.E.2d at 476 (citing 25 C.F.R. § 23.108(a)–(b) (providing that, except as otherwise required by federal or tribal law, the determination of whether a child is a member of a tribe or eligible for membership in a tribe is solely within the jurisdiction and authority of the tribe, with a state court lacking the authority to substitute its own membership determination for that of a tribe)), the trial court may make an independent determination concerning a child's status as an Indian child based upon the available information in the event that the relevant tribes repeatedly fail to respond to written membership inquiries in spite of diligent efforts to obtain a response made by the petitioner. Indian Child Welfare Act Proceedings 81 Fed. Reg. at 38,806; *In re E.J.B.*, 375 N.C.

at 102, 846 S.E.2d at 476. However, in the event that "a tribe fails to respond to multiple written requests, the trial court must first seek assistance from the Bureau of Indian Affairs," *In re E.J.B.,* 375 S.E.2d at 102, 846 S.E.2d at 476 (citing 23 C.F.R. § 23,105(c) (providing that, if "the Tribe contacted fails to respond to written inquiries," the requesting party "should seek assistance in contacting the Indian Tribe from the" Bureau of Indian Affairs), before making its own independent determination.

In her brief, respondent-mother argues the trial court failed to comply with requirements of ICWA in light of the fact that it had been reported at an early stage of the proceedings that Ned might be an Indian child through his maternal grandmother in upstate New York. Although respondent-mother acknowledges that DSS sent inquiries to a number of tribes and received a response from the Eastern Band of Cherokee Indians that Ned was neither a member nor eligible for membership in the tribe, she argues that the question of whether Ned was an Indian child by virtue of his New York ancestry remained unresolved throughout the entire course of the proceedings before the trial court and that, until a determination has been made concerning the issue of whether Ned is an Indian child as a result of his potential affiliation with a tribe in New York, the trial court had failed to comply with the requirements of ICWA. We conclude that respondent-mother's argument has merit.

As the record reflects, Judge Jimmy L. Myers, who addressed the issue of whether Ned should be held in nonsecure custody early in the juvenile proceedings, was aware that Ned had "possible Native American heritage through [respondent-mother's] maternal grandmother" as early as the date upon which the 28 February 2018 order addressing the need for Ned to remain in nonsecure custody was entered. In that order, Judge Myers found that "[r]espondents report Native American Heritage" and that the parties "have reason to know that the juvenile is an Indian Child." As a result, Judge Myers ordered DSS to "make diligent efforts to verify the juvenile's status as an Indian Child and notify the tribe that the respondents believe to be a member of . . . and/or contact the Bureau of Indian Affairs[.]"

A nonsecure custody report submitted by DSS on 7 March 2018 indicated "[an] Indian Child Welfare Act application has been submitted in reference to the respondent[-]mother's grandmother's Indian heritage." In a report submitted on 25 April 2018 in connection with the initial dispositional hearing, DSS stated that Ned was not subject to ICWA given that DSS had "sent the necessary ICWA inquiry letters," that it had received a response from the Eastern Band of Cherokee Indians indicating that Ned was neither a registered member nor eligible to register as a member of the tribe, and that DSS was "waiting for responses to the remaining inquiries." The same information was contained in reports that DSS submitted in connection with permanency planning and review hearings held in August 2018 and March 2019.

In an order entered following the 6 March 2019 review and permanency planning hearing, Judge Covington found that "[t]he minor child is not an Indian child according to the information reported by [DSS,]" that "[t]he minor child is not a member of the Eastern Band of Cherokee Indians," and that "[DSS] is awaiting responses from other tribes." The report that DSS submitted in connection with a May 2019 permanency planning and review hearing contained no additional information, so the trial court reiterated Judge Covington's earlier finding that "[t]he minor child is not an Indian child" in the order that was entered as a result of the 29 May 2019 hearing. The trial court's termination order did not address the extent to which the efforts in which DSS had engaged resulted in adequate compliance with ICWA's notice requirements.

As was the case in *In re E.J.B.,* 375 N.C. at 103, 846 S.E.2d at 477, "the trial court had reason to know that an Indian child might be involved" in this case. In addition, given that the notices that DSS sent to the relevant tribes are not contained in the record, we have no basis for determining whether they complied with the requirements for the contents of such notices set out in 25 U.S.C. § 1912 and 25 C.F.R. § 23.111(d). Finally, given the absence of a response from any of the tribes to which DSS sent notice other than the Eastern Band of Cherokee Indians and given the absence of any indication that, following the failure of these other tribes, which are not specifically identified in the record, to respond, DSS sought "assistance from the Bureau of Indian Affairs prior to making its own independent determination" of

whether Ned was an Indian child as required by 25 C.F.R. § 23.105(c), the record fails to contain sufficient information to permit a determination that the trial court adequately ensured that compliance with the notice requirements of ICWA actually occurred. As a result, we hold that this case should be remanded to the District Court, Davidson County, for further proceedings concerning the issue of whether the notice requirements of ICWA were complied with prior to the entry of the trial court's termination order and whether Ned is an Indian child for purposes of ICWA. In the event that the trial court concludes upon remand, after making any necessary findings or conclusions, that the notice requirements of ICWA were properly complied with or that Ned was not an Indian child, it shall reaffirm the trial court's termination order. In the event that the trial court determines on remand that Ned is, in fact, an Indian child, it shall vacate the trial court's termination order and "proceed in accordance with the relevant provisions of" ICWA. *In re E.J.B.*, 375 N.C. at 106, 846 S.E.2d at 479.

## III. Conclusion

Thus, for the reasons set forth above, we hold that the trial court did not err by failing to make inquiry on its own motion into the issue of whether a guardian *ad litem* should have been appointed for respondent-mother and that the trial court did not err in making the findings of fact, conclusions, and discretionary determinations contained in the trial court's adjudication and dispositional decisions. However, given the absence of any indication that the trial court complied with the notice provisions

of ICWA, this case is remanded to the trial court for further proceedings not inconsistent with this opinion.

REMANDED.